**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 01-60793-mhm |
| LYNXUS, INC., | ) | CHAPTER 7 |
| | ) | |
|     Debtor. | ) | |
| _____ | ) | |
| | ) | |
| TAMARA MILES OGIER AS | ) | |
| CHAPTER 7 TRUSTEE | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | ADVERSARY PROCEEDING |
| v. | ) | NO._____ |
| | ) | |
| FIRST HEROES, INC. | ) | |
| | ) | |
|     Defendant. | ) | |

<u>**COMPLAINT**</u>

Plaintiff Tamara Miles Ogier as Chapter 7 Trustee of the above-styled bankruptcy matter files this Complaint against Defendant First Heroes, Inc. (hereinafter referred to as "Defendant"), and shows this Honorable Court the following:

1.

Lynxus, Inc. ("Debtor") filed for chapter 7 bankruptcy relief on January 23, 2001

2.

Tamara Miles Ogier is the duly appointed and qualified Trustee for the above-styled bankruptcy matter.

3.

This is a core proceeding arising in or related to the case of <u>In re Lynxus, Inc.,</u> Case No. 01-60793-mhm, pending in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, (the "Bankruptcy Case").  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334 and 157.  This Court may issue appropriate orders or judgments pursuant to 28 U.S.C. § 157(b)(2) as this matter is a core proceeding.

4.

Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.

Defendant First Heroes, Inc. is subject to the jurisdiction and venue of this Court and may be served c/o its Registered Agent, National Registered Agents, Inc. of NV, at 1000 East William Street, Suite 204, Carson City NV 89701 or c/o its President Joseph J. Meuse at 360 Main Street, Washington, VA 22747 or otherwise pursuant to Fed. R. Bankr. P. 7004.

PLEADING BACKGROUND

6.

Defendant was formerly known as Penn-Akron
Corporation, Spherus Technologies, Inc. ("Spherus"), and
Heroes, Inc.

7.

On or about March 15, 2001, Plaintiff Tamara Miles
Ogier as Trustee ("Trustee") filed a pleading in the
Bankruptcy Case titled Motion to Sell Assets of the Estate
Free and Clear of Liens by Public Auction Conducted by
Elrod Auction Co., Inc. and by Private Sales Through the
National Association of Bankruptcy Trustee's Internet Site
and For Authorization to Pay Certain Administrative
Expenses (the "Motion to Sell").

8.

In the Motion to Sell, the Trustee sought, among other
things, to sell assets of the Estate consisting of office
furniture, furnishings and equipment and computers and
peripherals.  A true and correct copy of the Motion to Sell
is attached hereto and incorporated herein by reference as
Exhibit 1.

9.

In the Motion to Sell, the Trustee sought authority to
sell, among other things, certain computer units listed as

53 WEBU Units and 1000 TV Scan Converters in exhibit A attached to the Motion to Sell (the 53 WEBU Units and 1000 TV Scan Converters hereinafter collectively referred to as "The Computer Parts").

10.

On March 20, 2001, the Trustee filed a pleading in the Bankruptcy Case titled Amended Motion to Sell Assets of the Estate Free and Clear of Liens by Public Auction Conducted by Elrod Auction Co., Inc. and by Private Sales Through the National Association of Bankruptcy Trustee's Internet Site and For Authorization to Pay Certain Administrative Expenses (the "Amended Motion to Sell"). A true and correct copy of the Amended Motion to Sell is attached hereto and incorporated herein by reference as Exhibit 2.

11.

The Amended Motion to Sell simply set forth information regarding certain entities' assertions of liens and/or interests in some of the assets listed for sale in the Motion to Sell and the Trustee's position with regard to those assets.

12.

On April 12, 2001, the Defendant, filed a pleading in the Bankruptcy Case titled, Opposition to Trustee's Motion and Amended Motion to Sell Assets of the Estate Free and

Clear of Liens (the "Response").   A true and correct copy of The Response is attached hereto and incorporated herein by reference as Exhibit 3.

### 13.

The Response alleged that the Defendant was the actual owner of The Computer Parts as the Debtor held The Computer Parts as agent for the Defendant.  Therefore, the Defendant prayed that the Court deny the Motion to Sell with regard to The Computer Parts.

### 14.

On April 19, 2001, the Trustee filed a pleading in the Bankruptcy Case titled Trustee's Reply to Objection to Sale by Spherus ("Trustee's Reply").  A true and correct copy of The Reply is attached hereto and incorporated herein by reference as Exhibit 4.

### 15.

Trustee's Reply disputes and counters the Defendant's assertions of ownership in The Computer Parts.

### 16.

On April 26, 2001, the Court entered an order that, among other things, authorized the sale of The Computer Parts and allowed for the Defendant's claim of title to attach to the proceeds of sale. A true and correct copy of

said order is attached hereto and incorporated herein by
reference as Exhibit 5.

17.

The proceeds of the sale of The Computer Parts were
approximately $28,340.00.  Said funds are on deposit in a
segregated interest bearing account.

FACTUAL BACKGROUND

18.

In the latter part of 1990's, the federal government
created a program to subsidize the introduction of the
Internet in public school classrooms ("Federal Program").

19.

The Metropolitan Regional Educational Services Agency
("MRESA"), a body representing several school districts,
contracted, on behalf of certain schools, with the
Defendant (when it was known as Spherus) to provide the
hardware and software required for the implementation of
the Federal Program (the "MRESA contract").

20.

The Defendant was eventually not able to perform
under the MRESA Contract.  Before its default, the
Defendant entered into a contract with the Debtor (the
"Debtor's Contract") whereby the Debtor took over from the

Defendant the performance obligations set forth in the MRESA Contract.

21.

After the execution of the Debtor's Contract, the Defendant's role was as a mere conduit for receiving the proceeds from the MRESA contract and forwarding on to the Debtor its agreed upon share of said proceeds.

22.

In return for the Debtor's performance under the Debtor's Contract and, by extension, the MRESA Contract, the Defendant was obligated to remit to the Debtor 95% of funds paid to the Defendant under the MRESA contract.  The Defendant was authorized under the Debtor's Contract to keep 5% of funds paid to the Defendant under the MRESA contract for obtaining the MRESA Contract in the first place and/or for having the requisite Federal contract number needed to receive funds under the Federal Program.

23.

Pursuant to the Debtor's Contract, the Debtor was an independent contractor and retained control over the time and manner of performance of its duties under the Debtor's Contract and, by extension, the MRESA contract.

24.

The Debtor's Contract also provides that the Debtor shall not in any way serve as an agent of the Defendant.

25.

The Debtor's Contract also provides that the Debtor retain its own subcontractors and assistance and has the sole responsibility for their performance.

26.

The Debtor's Contract further provides that the Debtor is to coordinate, manage and administer performance to the various participating schools.

27.

During performance of its obligations under the Debtor's Contract and, by extension, the MRESA Contract, the Debtor entered into contracts with third party vendors.

COUNT 1

PROPERTY OF THE ESTATE

28.

Plaintiff repeats and re-alleges its allegations in all of the above paragraphs of the Complaint as if fully set forth herein.

29.

The Debtor did not acquire The Computer Equipment for the Defendant as its agent.  Rather, the Debtor, on behalf

of itself, and in furtherance of its performance of the
Debtor's Contract and, by extension, the MRESA Contract,
entered into third party vendor contracts for The Computer
Equipment.

30.

The Debtor paid for The Computer Equipment upon its
delivery to the Debtor from the third party vendors.

31.

At all times after the delivery of The Computer
Equipment to the Debtor through the filing of The
Bankruptcy Case, The Computer Equipment was titled in or
otherwise owned by the Debtor.

32.

The Computer Equipment was part of the Debtor's
inventory when it filed The Bankruptcy Case.  Therefore,
pursuant to 11 U.S.C § 541, The Computer Equipment was
property of the Bankruptcy Estate upon the filing of the
Bankruptcy Case.

33.

At no time did the Defendant ever hold any interest,
ownership or otherwise, in The Computer Parts.  Therefore,
the Defendant is not entitled to any of the proceeds from
the sale of The Computer Parts.

34.

Therefore, pursuant to 11 U.S.C. §§ 363 and 541 and all other applicable law, the Trustee is entitled to entry of an Order declaring that the proceeds of the sale of The Computer Parts are property of the Estate unencumbered by any interest whatsoever of the Defendant.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court:

1.   Enter an Order declaring that the proceeds of the sale of The Computer Parts are property of the Estate unencumbered by any interest whatsoever of the Defendant.

2.   Grant such other and further relief as the Court deems just and appropriate.

ELLENBERG, OGIER,
ROTHSCHILD & ROSENFELD, P.C.

By:  /s/  *Allen Rosenfeld*
          Allen Rosenfeld
          Georgia Bar No. 614451

170 Mitchell Street
Atlanta, GA 30303
(404) 525-4000
apr@eorrlaw.com

Exhibit 1

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

01 MAR 15  PM 12: 57

| IN RE: | ) | CASE NO. A01-60793 |
| | ) | |
| LYNXUS, INC., | ) | CHAPTER 7 |
| | ) | |
| Debtor(s). | ) | JUDGE MURPHY |

## MOTION TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS BY PUBLIC AUCTION CONDUCTED BY ELROD AUCTION CO., INC. AND BY PRIVATE SALES THROUGH THE NATIONAL ASSOCIATION OF BANKRUPTCY TRUSTEE'S INTERNET SITE AND FOR AUTHORIZATION TO PAY CERTAIN ADMINISTRATIVE EXPENSES

COMES NOW, Tamara Miles Ogier as Trustee in the above-referenced bankruptcy case, who shows this Honorable Court the following:

1.

Tamara Miles Ogier is the duly appointed and qualified Trustee in the above-captioned bankruptcy matter.

2.

The Trustee proposes to sell assets of the Estate consisting of office furniture, furnishings and equipment and computers and peripherals, including but not limited to internet service provider hardware and software and peripherals. A more complete list of the items to be sold is attached hereto and incorporated herein as Exhibit A.  Trustee has solicited private offers, but has not received any acceptable offers.  Trustee desires to use N.A.B.T. internet to maximize returns and to schedule an auction to liquidate the property that does not sell within a reasonable time.

## AS TO THE NATIONAL ASSOCIATION OF BANKRUPTCY TRUSTEE'S INTERNET SALES SITE

3.

The computers, peripherals, internet service provider hardware and software, and appropriate office equipment shall be offered to the public through listing on the National Association of Bankruptcy Trustee's, (hereinafter "NABT"), internet sales site in order to obtain maximum exposure

for minimum expense.

4.

There is no cost involved in utilizing the NABT internet sales site.

5.

It is anticipated that minimum bids will be set with the assistance of Tom Arcuragi, former principal of Debtor.

6.

The Trustee will begin placing items on the NABT site within the next seven (7) days, all sales being subject to approval of this Motion.

<u>AS TO ELROD AUCTION COMPANY, INC.</u>

7.

Elrod Auction Company, Inc., was employed by this bankruptcy estate pursuant to Order entered on February 28, 2001.

8.

Elrod Auction Company has requested a 10% commission on those items it auctions as well as extraordinary expenses of sale, subject to bankruptcy court approval.

9.

It is anticipated that all items unsold through the NABT site will be auctioned by public auction conducted by Elrod Auction Company, Inc.

10.

Additionally, Elrod Auction Company, Inc. will auction the office furniture and furnishings.

11.

No minimum bids will be required by the Trustee for those items auctioned by Elrod Auction Company, Inc.

12.

The auction conducted by Elrod Auction Company shall take place on the 26th day of April, 2001 at 10:00 A.M. at the Debtor's former business location  99 Krog Street, Atlanta, GA.

<u>AS TO ALL SALES</u>

13.

The sales shall be free and clear of liens. Any liens found to be appropriate by this Court shall attach to the proceeds of sale to the extent of its validity, priority, and amount.  The sales are not in the ordinary course of business.

14.

Trustee is continuing to offer the computers, peripherals, software and other hardware to individuals and companies in an attempt to obtain the highest price for the specialized internet service provider hardware and software and peripherals.

15.

Any personal property for which the Trustee receives an acceptable private sale offer , not generated by the NABT internet site, will be withdrawn from the NABT site and a separate motion will be filed to obtain court approval for such sales.

16.

The Trustee will cause notices of the proposed sales to be mailed to all parties in interest, said time for objection being as set forth in the Order and Notice of Sale.

17.

Personal property determined by Trustee to be leased will not be sold at auction or through the NABT.

<u>**AS TO PAYMENT OF ADMINISTRATIVE EXPENSES**</u>

18.

It is anticipated that the Estate will incur administrative rent costs for utilizing approximately 4000 square feet of space at Debtor's business location, 99 Krog Street from approximately March 15, 2001 to approximately April 30, 2001.

19.

Landlord, 99 Krog Associates, LLP has set rent on the space at $2000.00 per month. Therefore, it is anticipated that the Estate will incur an administrative expense claim from landlord for the time period aforesaid in the approximate amount of $3000.00.

20.

Landlord is accommodating the needs of this Estate; therefore, Trustee requests authorization to remit to landlord payment in an amount not to exceed $3000.00 for utilization of the space for the time period set forth herein when said funds are available and sufficient to pay all administrative expenses.

**WHEREFORE,** Trustee prays this Honorable Court approve her Motion To Sell Assets Of The Estate Free And Clear of Liens By Public Auction by Elrod Auction Company, Inc. and By Private Sales Conducted Through the National Association of Bankruptcy Trustee's Internet Sales Site upon the terms and conditions as set forth herein and authorize Trustee to remit to Landlord administrative rent in an amount not exceeding $3000.00.

This the 15 day of _____, 2001.

ELLENBERG, OGIER & ROTHSCHILD, P.C.

By: _____
    Richard D. Ellenberg
    Georgia Bar No. 243500

170 Mitchell Street, S.W.
Atlanta, Georgia 30303
(404) 525-4000

*728-848 6442*

99 Krog St

| | | | |
|---|---|---|---|
| MAX TNT 2AC | 1 | 20000 | 20000 *maybe leased* |
| MAX TNT 2DC | 2 | 20000 | 40000 |
| X-Stop Filters | 8 | 500 | 4000 |
| CooperEgde 150 | 1 | 2000 | 2000 |
| Cisco 7200 | 2 | 25000 | 50000 |
| Cisco PIX Firewall | 1 | 5000 | 5000 |
| Extreme Summit 48 | 3 | 1000 | 3000 |
| Extreme Summit 24 | 4 | 750 | 3000 |
| APC Smart UPS 1000 | 4 | 100 | 400 |
| APC Smart UPS 2200 | 4 | 125 | 500 |
| Powerware VPS 9125 | 2 | 175 | 350 |
| HP LH II | 2 | 1800 | 3600 |
| HP LH III | 6 | 2000 | 12000 |
| HP LH 4 | 5 | 2500 | 12500 |
| HP 8port Console Switch | 1 | 250 | 250 |
| HP 4port Console Switch | 1 | 200 | 200 |
| HP Surestore DLT40 | 4 | 50 | 200 |
| HP Surestore DAT24 | 3 | 25 | 75 |
| Intel 2Us | 10 | 1500 | 15000 |
| Netcomp Tower Server | 3 | 1000 | 3000 |
| Server Towers | 3 | 500 | 1500 |
| Netcomp Mini Towers Servers | 2 | 250 | 500 |
| HP LaserJet 6P | 1 | 100 | 100 |
| HP LaserJet 4000 | 4 | 300 | 1200 |
| HP LaserJet 4500 | 1 | 450 | 450 |
| 17" Monitors | 23 | 50 | 1150 |
| 14" or 15" Monitors | 32 | 25 | 800 |
| Stellar2 Disk Duplicator | 1 | 7000 | 7000 |
| CD-R | 1 | 10 | 10 |
| MinoltaFax 5500 | 1 | | *leased* |
| Workstation Boxes | 26 | 25 | 650 |
| Minolta Copier | 2 | | *leased* |
| Racks | 12 | 60 | 720 |
| TV Scan Converters | *approx.* 1000 | 15 | 15,000 |
| WEBU Units | 53 | 5000 | 265,000 |
| MAX 200 | 200 | 9 | 1,800 |
| Pipeline 130 | 150 | 8 | 1,200 |
| Pipeline 50 | 90 | 7 | 630 |
| Pipeline 75 | 100 | 4 | 400 |
| | | | 970285 |

(Definity PBX)

| | | | |
|---|---|---|---|
| Wall Modules | 2 | | |
| Intuity | 1 | | |
| Monitors | 2 | | |
| Handsets | 60 | | |
| Super Handset | 4 | *leased* | |
| Console | 1 | | |
| Headsets | 17 | | |
| Adapters | 14 | | |
| transformers | 24 | | |

*see attached*

| | | |
|---|---|---|
| | 15000 | 15000 |
| Subtotal This Page | | 985285 |
| Grand Total Both Pages | | 1151235 |


EXHIBIT
tabbies
a

## Lynxus Definity PBX Inventory

(Definity PBX)

| | |
|---|---:|
| Definity Prologix PBX | 1 |
| 2 Wall Mounted  ; 100 ports; 2 T1 cards | |
| Paradyne Acculink 3150 | 1 |
| Paradyne Comsphere 3820 | 1 |
| Control Control Console | 1 |
| Intuity | 1 |
| 8434DX | 6 |
| 8410D+ | 22 |
| 8405D+ | 28 |
| 8405B | 44 |
| Operator Console | 1 |
| Headsets | 31 |
| Headset Adapter | 54 |
| Headset plugs | 65 |
| transformers | 84 |

Grand Total Both Pages                                    #REF!

| Description | Quantity |
| --- | --- |
| **Office Cubicles** | |
| 4x4  walls | 37 |
| 2x4 walls | 35 |
| 2x4 cube desktops | 39 |
| 4x6 walls | 10 |
| 3x6 walls | 1 |
| 2x6 plexi cube wall | 5 |
| desktop mounted file cabs | 6 |
| | |
| **Various** | |
| 2-Drawer file cabinets | 54 |
| rolling office chairs | 58 |
| grey chairs (non rolling) | 6 |
| 8 foot folding tables (plastic) | 4 |
| 6 foot folding tables (plastic) | 7 |
| 6 ft shelving (plastic) | 5 |
| fans | 4 |
| desks | 4 |

| Description | Quantity |
| --- | --- |
| **Office Cubicles** | |
| 4x4  walls | 37 |
| 2x4 walls | 35 |
| 2x4 cube desktops | 39 |
| 4x6 walls | 10 |
| 3x6 walls | 1 |
| 2x6 plexi cube wall | 5 |
| desktop mounted file cabs | 6 |
| | |
| **Various** | |
| 2-Drawer file cabinets | 53 |
| rolling office chairs | 58 |
| grey chairs (non rolling) | 6 |
| 8 foot folding tables (plastic) | 4 |
| 6 foot folding tables (plastic) | 7 |
| 6 ft shelving (plastic) | 5 |
| fans | 4 |
| desks | 4 |

# Techno – Pallet

Misc Blanking Panels

| | |
|---|---|
| 1 | Harmonic Data Enturprize 601 Sat. Receiver |
| 1 | TUB Power Cords |
| 1 | TUB Extension Cords |
| 1 | TUB Powerstrips |
| 2 | TUBS Coax Cable |
| 5 | TUBS CAT-5 cable |
| 1 | Fax machine – Sharp |
| 1 | Misc Cable Tub |
| 1 | TUB Phone Cords + RF misc. |
| 3 | Boxes Power Cords |
| 1 | TUB Hardware |
| 1 | TUB of Note Book Computers + peripherals |
| 1 | TUB of TIE Down + TUB LIDS |
| 1 | Box of CAT-5 scraps |
| 3 | Partial Spools of RG-6 Coax |

Assorted Office Supplies

## CERTIFICATE OF SERVICE

This is to certify that I have this date served a true and correct copy of MOTION TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS BY PUBLIC AUCTION CONDUCTED BY ELROD AUCTION COMPANY, INC. AND BY PRIVATE SALES THROUGH THE NATIONAL ASSOCIATION OF BANRKUPTCY TRUSTEES' INTERNET SITE AND FOR AUTHORIZATION TO PAY CERTAIN ADMINISTRATIVE EXPENSES, upon the following parties by U.S. Mail, first class, postage prepaid to:

David W. Cranshaw
Bill Sheppard
Morris, Manning & Martin
1600 Atlanta Financial Center
3343 Peachtree Rd. N.E.
Atlanta, Ga. 30326-1044

United States Trustee
362 Richard B. Russell Bldg.
75 Spring Street
Atlanta, GA 30303

J. Michael Lamberth, Esq.
Lamberth, Bonapfel, Cifelli & Stokes, PA
EastTower - Suite 550
3343 Peachtree Road, NE
Atlanta, GA 30326-1022

This the 15 day of March, 2001.

ELLENBERG, OGIER & ROTHSHCILD, P.C.

Richard D. Ellenberg
Georgia Bar No. 243500

170 Mitchell St., SW
Atlanta, GA 30303
(404) 525-4000

Exhibit 2

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                          )      CASE NO. 01-60793
                                )
LYNXUS, INC.                    )      CHAPTER 7
            Debtor.             )      JUDGE MURPHY
_____ )

## AMENDED MOTION TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS BY PUBLIC AUCTION CONDUCTED BY ELROD AUCTION CO., INC. AND BY PRIVATE SALES THROUGH THE NATIONAL ASSOCIATION OF BANKRUPTCY TRUSTEE'S INTERNET SITE AND FOR AUTHORIZATION TO PAY CERTAIN ADMINISTRATIVE EXPENSES

COMES NOW Trustee, Tamara Miles Ogier, who amends her Motion to Sell as titled above, to set forth information as to liens which may attach to the property to be sold.

1.

Spherus Technologies Inc., ( hereinafter "Spherus"), has asserted a lien upon certain personal property to be sold based upon a "special interest" in the property as alleged by Spherus. . Spherus claims the special interest pursuant to alleged specific identification of certain items of inventory and its payment therefor.

2.

The Trustee disputes Spherus Technologies Inc.'s claim upon this personal property.

3.

The following companies have asserted an interest in Debtor's inventory through a lease:

a) Minolta Business Solutions - Minolta copier and fax machine

b) Avaya Financial Services - telephone system (Lucent Generic 3) and

Ascend Data Equipment

c) Micron Leasing /Orix - seven (7) computers with peripherals & workstations (not

listed on inventory)

4.

No equipment that the Trustee determines is subject to a valid lease will be sold by

Trustee.

5.

All other information contained in Trustee's Motion remains unchanged.

WHEREFORE, Trustee prays that this Court grant her Motion and Amended

Motion upon the terms and conditions as set forth therein.

ELLENBERG, OGIER & ROTHSCHILD, P.C

By:_____

Richard D. Ellenberg
Ga. Bar No. 243500

170 Mitchell St., SW
Atlanta, GA 30303
(404)525-4000

## CERTIFICATE OF SERVICE

This is to certify that I have this date served a true and correct copy of AMENDED

MOTION TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS BY

PUBLIC AUCTION CONDUCTED BY ELROD AUCTION COMPANY, INC. AND BY

PRIVATE SALES THROUGH THE NATIONAL ASSOCIATION OF BANRKUPTCY

TRUSTEES' INTERNET SITE AND FOR AUTHORIZATION TO PAY CERTAIN

ADMINISTRATIVE EXPENSES, upon the following parties by U.S. Mail, first class,

postage prepaid to:

> David W. Cranshaw
> Bill Sheppard
> Morris, Manning & Martin
> 1600 Atlanta Financial Center
> 3343 Peachtree Rd. N.E.
> Atlanta, Ga. 30326-1044
>
> United States Trustee
> 362 Richard B. Russell Bldg.
> 75 Spring Street
> Atlanta, GA 30303
>
> J. Michael Lamberth, Esq.
> Lamberth, Bonapfel, Cifelli & Stokes, PA
> EastTower - Suite 550
> 3343 Peachtree Road, NE
> Atlanta, GA 30326-1022
>
> Minolta Business Solutions
> One International Blvd., 10th Floor
> Mahwah,NJ 07430-0631
>
> Avaya Financial Services
> 650 CIT Drive
> Livingston, NJ 07039
>
> Micron Leasing
> P.O. Box 7023
> Troy, MI 48007-7023

Orix Credit Alliance
P.O. Box 1640
Pittsburgh, PA 15230-1640

Krog Associates, LLP
1708 Peachtree Street., Suite 208
Atlanta, GA 30309

This the _20_ day of March, 2001.

ELLENBERG, OGIER & ROTHSHCILD, P.C.

_____

Richard D. Ellenberg
Georgia Bar No. 243500

170 Mitchell St., SW
Atlanta, GA 30303
(404) 525-4000

Exhibit 3

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. A01-60793 |
| LYNXUS, INC., | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | JUDGE MURPHY |

**OPPOSITION TO TRUSTEE'S MOTION AND
AMENDED MOTION TO SELL ASSETS OF
THE ESTATE FREE AND CLEAR OF LIENS**

COMES NOW, Heroes, Inc. f/k/a Penn-Akron Corporation, f/k/a Spherus Technologies, Inc. ("Heroes") and files its Opposition to Trustee's Motion and Amended Motion to Sell Assets of the Estate Free and Clear of Liens, showing this Court the following:

1.

Trustee Tamara Ogier filed a Motion and Amended Motion (collectively the "Motion") seeking to sell assets of the estate (the "Estate") of Lynxus, Inc. ("Lynxus") free and clear of liens and claims by creditors.

2.

In the Motion, the Trustee alleged that Heroes "has asserted a lien upon certain personal property to be sold based upon a 'special interest' in the property." The Trustee also alleged that Heroes "claims the special interest pursuant to

24
CM

alleged specific identification of certain items of inventory and its payment therefor." [Amended Motion ¶ 1.]

3.

The Trustee's characterization of Heroes' claim to the personal property at issue (the "Equipment") is not accurate. Rather than asserting a "special interest" in the Equipment, Heroes asserts that it is the owner of the Equipment and that the Equipment does not constitute property of the Estate.

4.

The basis of Heroes' claim is two-fold. First, the transaction between Heroes and Lynxus was not a sale of goods and the Equipment in Lynxus's possession was not its inventory. Rather, Heroes contends that Lynxus purchased the Equipment as an agent for Heroes. As between Heroes and Lynxus, Lynxus cannot contest Heroes title to the Equipment. Second, Heroes contends that, if the transaction between Heroes and Lynxus is treated as a sale of the Equipment, that sale was completed and the Equipment was constructively delivered to Heroes. Thereafter, the Equipment remained in Lynxus's possession in a bailment so that Lynxus could perform additional services in connection with its ongoing relationship with Heroes.

5.

The contractual relationship between Heroes and Lynxus arises from an "Internet Services Implementation Agreement" (the "Contract") dated September 14, 1999.   In the Contract, Heroes was referred to as the "Company" and Lynxus was referred to as the "Consultant."   A true and correct copy of the Contract is attached hereto as Exhibit A.

6.

The Contract contains certain terms that are relevant to the Trustee's Motion.   In the recitals section of the Contract, Lynxus and Heroes outlined the background, purpose, and nature of their contractual relationship as follows:

> Company has entered into a Master Network Implementation Agreement ("Master Agreement") with the Metropolitan Regional Educational Services Agency ("MRESA") . . . for the implementation and installation of an internet based video distribution and multi-media network for installation at elementary and secondary school "Locations") participating in the "E-Rate" program under contract to MRESA. . . .

> Pursuant to its obligations for delivery, installation, and testing of specific hardware and software pursuant to the Master Agreement, Company has entered into a number of "Vendor Contracts" that provide for delivery of the component parts for the network installation, and for the assembly, installation, and testing of same, as well as other matters, such as warranties, ongoing maintenance, and support that are outside of Consultant's Services hereunder.

Consultant is an internet service provider with certain expertise necessary to coordinate and manage the delivery, installation and testing requirements applicable to the Vendor supplied hardware, software, and other deliverables, and to administer the disbursement of funds to such Vendors.

Company and Consultant desire to enter into an agreement whereby [c]onsultant, on behalf and for the benefit of Company, will coordinate, manage and administer performance f the Vendor Contracts and the installation of the network components to schools located in certain school districts (the "Marketing Services Area"), as defined below, in a manner consistent with the Master Agreement . . ..

[Contract, Recitals.]

7.

Pursuant to intention of the parties to create a principal-agent relationship, the Contract states as follows:

Company hereby engages Consultant to provide management services in connection with the implementation of the MRESA*net 2000 Project* in accordance with the Master Agreement between Company and MRESA . . . in the name and for the account of Company, on an exclusive basis, subject to the terms and conditions set out herein ("Services"). . . .

In cooperation with Company, and in the name and for the account of Company, Consultant shall supervise, manage and direct in Company's name the implementation of Company's contractual obligations related to installation of the MRESA*net 2000 System* at each Location in accordance with the specifications and standards set out in the Master Agreement consistent with prudent management practices . . ..

#780784 v1 - HEROES-Opp to Mot to Sell Assets

> . . . In the performance of its duties as Consultant and manager of the Services, Consultant shall act solely as the representative of Company. . . . Consultant may so inform third parties with whom it deals on behalf of Company and may take any other reasonable steps to carry out the intent of this Section 4.1. [and]

> In performing its duties hereunder, Consultant shall act solely in the name of and for the account of Company.

[Contract ¶¶ 1.1, 3.1, 4.1, 5.1.]

8.

An agent may not dispute his principal's title to property held for the principal. O.C.G.A. § 10-6-26. See also Courts v. Jones, 61 Ga. App. 874, 8 S.E.2d 178, 179-80 (1940) ("it is the duty of an agent to account to his principal for all property or funds belonging to his principal which come into his hands by virtue of his agency. . . . The agent must deliver the funds or property to his principal upon a proper demand therefor, or at such times as may be fixed by the express or implied terms of the agency, or upon termination of the agency, or he must satisfactorily explain why he does not do so.")

9.

Where property of the principal is held by a debtor at the time of filing bankruptcy, the property does not become property of the estate and may be recovered by the principal. See

#780784 v1 - HEROES-Opp to Mot to Sell Assets

*Scroggins v. Powell, Goldstein, Frazer & Murphy (In re: Kaleidoscope, Inc.)*, 15 B.R. 232 (Bktcy. N.D. Ga. 1981), *rev'd on other grounds*, 25 B.R. 729 (Bktcy. N.D. Ga. 1982).

10.

Lynxus received payment for the Equipment from Heroes and paid the purchase price for the Equipment with Heroes' money. Since Lynxus acted as Heroes agent in purchasing the Equipment, Lynxus did not own the Equipment. Rather, Lynxus held it in trust as an agent for Heroes and must turn it over to Heroes upon demand or termination of the agency.

11.

By letter dated October 9, 2000, Heroes terminated the Contract, thereby terminating Lynxus's agency. A true and correct copy of the October 9 letter is attached hereto and incorporated herein by reference as Exhibit B.

12.

Thereafter, Heroes demanded that Lynxus turn over the Equipment. By letter dated December 18, 2000, Lynxus acknowledged that demand and communicated its refusal to release the Equipment. A true and correct copy of the December 18 letter is attached hereto as Exhibit C.

#780784 v1 - HEROES-Opp to Mot to Sell Assets

13.

Prior to the Equipment being delivered to Lynxus from the vendors, Lynxus's personnel and Heroes' personnel had specific discussions about the payment for and delivery of the Equipment. Heroes directed that a payment be made to Lynxus in excess of $2.8 million for the Equipment and other services. Lynxus used Heroes money to pay for the Equipment.

14.

Upon that payment, Lynxus delivered the Equipment to Heroes. However, Lynxus retained possession of the Equipment in order to perform further services, including installation of computer software on the Equipment and, eventually, installation of the Equipment in the schools that were part of the MRESA*net 200 Project*. See O.C.G.A. § 11-2-401(2) (title to goods passes to the buyer at the time and place at which the seller completes his performance with reference to the delivery of the goods).

15.

The Equipment at issue in this instance is intended for use in an ongoing project. Heroes is still performing under its agreement with MRESA. If the Equipment is sold, Heroes will be required to obtain replacement equipment elsewhere in order to perform on its contract with MRESA. However, the Trustee's Motion makes clear that any sale of the Equipment by the Estate

will not result in a dollar-for-dollar realization against the purchase price that Heroes paid for the Equipment. Therefore, Heroes will be injured if the Equipment is sold and the funds escrowed for distribution through the bankruptcy Estate.

WHEREFORE, Heroes respectfully prays that the Court deny the Trustee's Motion with respect to the Equipment owned by Heroes and require that the Trustee return the Equipment to Heroes since it is not property of the Estate.

This 12th day of April, 2000.

Respectfully submitted,

**MORRIS, MANNING & MARTIN, LLP**

By: _____
William J. Sheppard
Georgia Bar No. 641980

Attorneys for Heroes, Inc.

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000
(404) 365-9532 (fax)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. A01-60793 |
| LYNXUS, INC., | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | JUDGE MURPHY |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I have caused service of the within and foregoing **OPPOSITION TO TRUSTEE'S MOTION AND AMENDED MOTION TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS** to be made upon al parties to the above-styled action via hand delivery addressed as follows:

> United States Trustee
> 32 Richard B. Russell Building
> 75 Spring Street
> Atlanta, Georgia 30303
>
> J. Michael Lamberth, Esq.
> Lamberth, Bonapfel, Ciffelli & Stokes, PA
> East Tower, Suite 550
> 3343 Peachtree Road, NE
> Atlanta, Georgia 30326
>
> Richard D. Ellenberg, Esq.
> Ellenberg, Ogier & Rothschild, P.C.
> 170 Mitchell Street, SW
> Atlanta, Georgia 30303

and via first class mail, with sufficient postage thereon to ensure delivery, addressed as follows:

> Minolta Business Solutions
> One International Blvd, 10th Floor
> Mahwah, New Jersey 07430-0631

Avaya Financial Services
650 CIT Drive
Livingston, New Jersey 07039

Micron Leasing
P.O. Box 7023
Troy, Michigan 48007-7023

Orix Credit Alliance
P.O. Box 1640
Pittsburgh, Pennsylvania 15230-1640

Krog Associates, LLP
1708 Peachtree Street
Suite 208
Atlanta, Georgia 30309

This ⟨12th⟩ day of April, 2001.

William J. Sheppard
Georgia Bar Number 641980

A

FINAL

DATE: September 17, 1999

# LYNXUS, INC.

## INTERNET SERVICES AND IMPLEMENTATION AGREEMENT

## WITH

## SPHERUS TECHNOLOGIES, INC.

INTERNET SERVICES IMPLEMENTATION AGREEMENT

THIS "AGREEMENT," is made and entered into as of ~~September 14, 1999~~, 1999, by and between SPHERUS TECHNOLOGIES, INC., a Georgia corporation ("Company"), and LYNXUS, INC. a Delaware corporation, ("Consultant"). In consideration of the mutual promises, covenants and agreements herein, Company and Consultant agree as follows:

## RECITALS

a.      Company has entered into a Master Network Implementation Agreement ("Master Agreement") with the Metropolitan Regional Educational Services Agency ("MRESA"), an administrative services agency, for the implementation and installation of an internet based video distribution and multi-media network for installation at elementary and secondary schools ("Locations") participating in the "E-Rate" program under contract to MRESA. The Master Agreement provides for the delivery, installation, and testing of certain hardware and software according to specifications established by MRESA.

b.      Pursuant to its obligations for delivery, installation, and testing of specified hardware and software pursuant to the Master Agreement, Company has entered into a number of "Vendor Contracts" that provide for delivery of the component parts for the network installation, and for the assembly, installation, and testing of same, as well as other matters, such as warranties, ongoing maintenance, and support that are outside of Consultant's Services hereunder.

c.      Consultant is an internet service provider with certain expertise necessary to coordinate and manage the delivery, installation and testing requirements applicable to the Vendor supplied hardware, software, and other deliverables, and to administer the disbursement of funds to such Vendors.

d.      Company and Consultant desire to enter into an agreement whereby consultant, on behalf and for the benefit of Company, will coordinate, manage and administer performance of the Vendor Contracts and the installation of the network components to schools located in certain specified school districts (the "Marketing Services Area"), as defined below, in a manner consistent with the Master Agreement, up to and including the completion and acceptance by MRESA of delivery and installation of the network system and management of the disbursement of payments to said Vendors. It is acknowledged and understood that this Agreement shall not apply to any services related to the implementation and installation of the network in certain of the school districts for which Company will be solely responsible, as more particularly defined below.

1.      ENGAGEMENT OF CONSULTANT; DEFINITIONS.

1.1      Consultant's Hiring. Company hereby engages Consultant to provide management services in connection with the implementation of the MRESA *net 2000 Project* in accordance with the

Master Agreement between Company and MRESA dated March 19, 1999, as modified by Amendment dated August 23, 1999, in the name and for the account of Company, on an exclusive basis, subject to the terms and conditions set out herein ("Services"). A copy of the Master Agreement, as amended, is attached as Exhibit "A." The Services include the coordination and administration of certain Vendor Contracts material to the completion of the Company's obligations under the Master Agreement. A Schedule and brief description of each Vendor Contract is attached at Exhibit "B." Company warrants and represents that copies of all such listed Vendor Contracts have been delivered to Consultant as of the date of this Agreement. The parties acknowledge that additional or substituted Vendor Contracts may be entered into hereafter by Company in the course of its performance under the Master Agreement. All such additional Vendor Contracts shall be promptly delivered to Consultant and the Schedule at Exhibit "B" shall be amended accordingly.

     1.2    <u>Marketing Services Area.</u>  The marketing services area shall include the Georgia school districts with which MRESA has contracted or may contract to be a member of the MRESA*net 2000 System*, identified as follows: Atlanta Public Schools, Buford City Schools, Clayton County Schools, Cobb County Schools, Dekalb County Schools, Douglas County Schools, Fulton County Schools, Gwinnett County Schools, Marietta City Schools, Rockdale County Schools, and Richmond County Schools (Augusta). For the purpose of Consultant's responsibilities under this Agreement, the Marketing Services Area shall <u>not</u> include the following school districts: Glynn County Schools, Chatham County Schools, and Decatur City Schools.

     1.3    "<u>MRESA*net 2000 System*</u>" shall mean the "Internet Based Satellite Video Distribution And Multi-Media System" which will be available to each school in the Metropolitan Regional Services Agency region.

     1.4    "<u>MRESA*net 2000 Project*</u>" shall mean the implementation of the MRESA*net 2000 System* to be installed in Phases which may collectively include approximately 700 schools in 14 school districts primarily in the Atlanta metropolitan area and surrounding counties, plus Savannah and Brunswick, as well as future expansion.

     1.5    "<u>MRESA</u>" shall mean the "Metropolitan Regional Educational Services Agency," a branch of the Georgia Department of Education as set forth in O.C.G.A. §20-2-270, *et. seq.*, that provides direct services to all eleven of the metro Atlanta school systems and three additional large systems across Georgia.

     1.6    "<u>Vendor Contracts</u>" shall mean agreements between Company and providers of hardware, software, and installation and delivery services material to the performance of Company's obligations under the Master Agreement, both currently existing, and hereafter engaged by Company and delivered to Consultant in the course of performing its Services hereunder, as provided in Paragraph 1.1, above.

     1.7    "<u>Location</u>" shall mean each individual elementary or secondary school site in the Marketing Services area that contracts with MRESA for installation of a MRESA*net 2000 System*.

2.    <u>TERM AND TERMINATION.</u>  The term of this Agreement shall be for a period of three (3)

years, commencing on the date hereof.

2.1    Annual Renewal.  This Agreement shall automatically renew for a period of one (1) year at the expiration of the previous term, should the Company fail to terminate this Agreement as set forth herein.  Notwithstanding the foregoing, this Agreement shall automatically terminate if the Services is sold or otherwise disposed of, all the remaining assets of the Company are liquidated, and the affairs of the Company are fully and completely wound up.

2.2    Termination.  Notwithstanding any other provision of this Agreement to the contrary, Company may terminate this Agreement at any time upon thirty (30) days prior written notice and opportunity to cure, should Consultant breach this Agreement after apprising Consultant of the extent and nature of such breach or failure, and allowing Consultant the above period to cure the same.  Notwithstanding anything contained herein to the contrary, all advances or guaranties by the Consultant or its affiliate company must be fully discharged for such termination to be valid.  In the event Company fails to timely deliver payments due hereunder ~~or Consultant's compensation is inadequate, subject to the provisions of Paragraph 3.5~~, Consultant may terminate this Agreement upon delivery of ten (10) days written notice to Company and opportunity to cure.

3.    CONSULTANT'S    MANAGEMENT    OF    MASTER    AGREEMENT;    VENDOR CONTRACTS.

3.1    Consultant's Services.    In cooperation with Company, and in the name and for the account of Company, Consultant shall supervise, manage and direct in Company's name the implementation of Company's contractual obligations related to installation of the MRESA*net 2000 System* at each Location in accordance with the specifications and standards set out in the Master Agreement consistent with prudent management practices, subject to the following:

(a)   It is agreed and acknowledged by Company that the scope of the Services hereunder is limited to the delivery, installation, and testing of specified hardware and software; clean-up of installation site; and, preparation and delivery of completion documentation.  The Services do not include any matter pertaining to collateral, ongoing, or any other agreement that contains continuing responsibilities among Company, Vendors, and Locations of the MRESA*net 2000 System* that survive or require performance after the date of the acceptance by MRESA including, but not limited to, (i) MRESA resale rights, (ii) remote technical support with respect to hardware or software, (iii) updates or modifications to the system or any component thereof, (iv) onsite maintenance or service, including onsite technical support and upgrades, (v) performance under any warranty or repair or replacement obligation, (vi) any instructional or training services, including the supply of operations manuals on paper or CD-Rom to the extent that the same are not included in any Vendor Contract as an item delivered upon installation, (vii) the payment of any license fees, royalties, or other continuing obligations to Vendors.  In addition, Consultant will not provide or install any shelving as may be needed for any equipment being deployed with system installation; all such shelving will be timely installed by Company at Company's expense.  Notwithstanding the foregoing, Consultant will (i) provide full hardware maintenance, technical support, and upgrade abilities for three years to each Location, and (ii) provide an MRESA*net2000*-Internet and Integration Training Program at each Location as required by the Master Agreement.  In connection with the technical support maintenance call center services described in the foregoing sentence, Consultant will incur certain one-time set up

– 3 –

costs which will be reimbursed by Company. A schedule of the support and training services provided, together with the support set-up costs is attached hereto as Exhibit "C."

(b)   Consultant will administer and supervise the performance of Vendors under the terms of the Vendor Contracts as the same relate to the deliverables specified in the Master Agreement only. Any and all obligations with respect to duties or obligations, responsibility or deliverables after the date of acceptance, as defined in the Master Agreement, shall remain with Company. Company will indemnify and hold harmless for any and all claims, liability, damages, and the like resulting from the failure of any vendor or other provider to perform under the Vendor Contract to the extent that such obligation survive the payment for the installation, delivery, testing, clean-up accrued in the initial set up of the MRESAnet 2000 System at each location. Consultant will disburse payments to respective Vendors in accordance with the Vendor Contract subject to and expressly conditioned upon the receipt of funds from Company for same, as specified in Paragraph 3.2 b), below.

(c)   Maintain all books, records, reports, and accounts in which shall be entered all transactions of Consultant with respect to Services and shall be open for inspection and copying by the Company.

(d)   Promptly assist and cooperate with the Company's accountants in performance of any accounting functions reasonably required of or by the Company's accountants.

(e)   Receive all cash paid upon completion of the Services with respect to each location along with all such funds furnished by Company and any other monies received by Consultant for or on behalf of Company in the Working Capital Account;

(f)   Pay and disburse on behalf and for the account of Company, as required for the operation of the Services, and all other disbursements directly or indirectly authorized by this Agreement; and any other charge, item of expense or other item which Consultant considers to be necessary or desirable for the operation of the Services and not otherwise expressly authorized or limited under this Agreement.

(g)   Commission on Funds Raised.   The parties hereto acknowledge and agree that from time to time Consultant will have the opportunity to raise funds on behalf of nonprofit entities or foundations expressly for the benefit of assisting Locations (SLC/USF) to pay for the Location's portion of Project Budget. Then and in that event, Consultant shall be entitled to a commission on all funds raised of twenty-five percent (25%).

3.2   Project Completion and Payment.

a)   Documentation.   Upon completion of each MRESAnet 200 Project for each Location, Consultant will prepare and submit to Company the information required by the Master Agreement for presentation to MRESA. Company will promptly deliver written notification of completion and a request for inspection to MRESA, together with an invoice for payment of the amounts due according to the Budget.

b)   Delivery of Funds to Consultant.   Promptly upon receipt of payment from the

Schools and Libraries Division of the United States Acceptance Corporation with respect to each Location, Company shall pay over to Consultant for deposit in the Working Capital Account (as provided in Paragraph 6, below) a sum equal to ninety-five percent (95%) of all such amounts if, as, and when received by Company. Similarly, with respects to costs which are payable by the Location, Company will promptly invoice and pay over an amount equal to ninety-five percent (95%) of all sums received from or on behalf of the Location in respect to its discount share of the total Location Budget. Notwithstanding the foregoing, Company shall set aside reserves from sums otherwise due to Consultant hereunder, sufficient to fund certain ongoing support, maintenance, upgrade, warranty, and repair obligations required to be performed by Company pursuant to the Master Agreement after delivery and acceptance of the MRESA*net2000 System*, all as more fully described on the attached Schedule "D."

c) <u>Payment to Vendors</u>. Consultant will have no obligation to pay any sums due under any Vendor Contract unless and until an amount equal to eighty percent (80%) of the funds due to Consultant's Working Capital Account, as provided in Subparagraph b), above, with respect to each Location are delivered to Consultant by Company. Company agrees to indemnify and hold harmless Consultant for any liability or claims asserted by Vendors on account of late payment or nonpayment caused by the failure of Company to deliver the foregoing sums in the manner described. Company shall be responsible for payment of any interest, penalties, surcharges, liquidated damages or costs of any kind incurred or accrued by reason of late or nonpayment to Vendors caused by failure to timely deliver the monies due under this paragraph.

3.3.    <u>Location Budgets.</u>  For each Location that desires to participate in the MRESA*net* 2000 *Project*, Consultant will deliver to Company an itemized budget that sets out all Vendor Contract costs for each such location and its approved funding therefor, by no later than forty five (45) days prior to the Project Commencement Date ("Location Budget"). Each Budget shall include, without limitation, Consultant's forecast of costs and expenses for the deliverables and Services for the Location. At the request of Company given to Consultant within 10 days after tender of the proposed Location Budget, Consultant's representatives shall review such budget with Company at the Location. Company's approval of the proposed Location Budget shall not be unreasonably withheld and shall be deemed given unless a specific written objection thereto is delivered by Company to Consultant within 15 days after the submission thereof. Consultant may revise the Location Budget from time to time to reflect any unpredicted significant changes, variables or events beyond Consultant's control or include significant additional unanticipated items of income or expense. Any such revision shall be submitted to Company for approval, which approval shall not be unreasonably withheld and shall be deemed given unless a specific written objection thereto is delivered to Consultant by Company within 10 days after submission thereof. Unbudgeted or unforecast expenditures unforeseen at the time of submission of the Location Budget and reasonably deemed necessary by Consultant in a bona fide emergency may be made without Company's prior authorization, except as provided in Section 3.1. Consultant may, without Company's consent, allocate all or any portion of any amount budgeted with respect to any one item in the Location Budget to another item budgeted therein. Consultant shall not be deemed to have made any guarantee, warranty or representation whatsoever in connection with the Location Budget. Company acknowledges that each Location Budget, are subject to and will be affected by changes in financial, economic and other conditions and circumstances beyond Consultant's control.

3.4    <u>Reports.</u>  The Consultant shall provide the Company with a final comprehensive

written reports as to the disbursement of funds with respect to each Location.

3.5   Compensation.   Consultant, as its fee for its services hereunder, shall receive one hundred percent (100%) of the balance of funds remaining in the Working Capital Account after the payment of all sums due under the Vendor Contracts upon acceptance of the MRES*net 2000 System.*

3.6   General Provisions.   Consultant shall retain all discretion and judgement to the manner and means of carrying out its duties hereunder subject, however, to the reasonable requests of the Company.  Consultant shall have the right of control and discretion as to the manner of performance of its services hereunder in that the result of the work and not the means by which it is accomplished shall be the primary factor for which the parties have bargained hereunder.  Consultant's obligations for performance of services hereunder, shall be limited to the completion of the managerial services described above in accordance with the Location Budget as set forth herein.  The Company shall not direct the details, manner or means by which Consultant accomplished the Services performed hereunder, provided that the Services are in accordance with the Budget and this Agreement.

3.7   Workers' Compensation Insurance.   Consultant shall obtain and maintain at all times hereunder their own workers' compensation insurance coverage at its own expense and, upon reasonable request, provide the Company with a certificate evidencing such coverage containing the policy number and the name and address of the carrier.  Notwithstanding any other indemnification contained herein.  Consultant shall indemnify, defend and hold the Company harmless from any and all claims arising out of any injury, disability, or death of Consultant's employees or otherwise, during the performance of any services hereunder or otherwise.

3.8   Liability and Other Insurance; Performance Bonds.   Company shall obtain and maintain at all times hereunder a policy of insurance, in the amount required by the Master Agreement, that names Consultant and its subcontractors as an additional insured, covering errors, omissions and negligent acts which may be committed by Consultant or any parties working under the direction of Consultant, as its employee or otherwise, during the performance of Services hereunder.   Company shall be solely responsible for obtaining any Performance Bonds required under the Master Agreement.

3.9   Subcontractors of Consultant.   Consultant may subcontract with and/or employ such parties upon such terms and conditions as it may deem proper or necessary.  Consultant shall allow the Company to inspect all contracts with its subcontractors and employees with regard to any services to be performed hereunder.  Each and every subcontract of employment entered into by and between Consultant and Consultant's subcontractors or employees with regard to any services to be performed hereunder shall state substantially as follows:

(a)   Consultant's subcontractors and/or employees are subcontractors and/or employees of Consultant alone (and not of the Company).

(b)   Consultant's subcontractors and/or employees are to be paid by Consultant alone (and not by the Company).

(c)   Consultant is contracting for the retention or employment of such subcontractors and/or employees on Consultant's own behalf and not as an agent of the Company,

unless otherwise expressly authorized in writing by the Company and:

(d)     No subcontract or contract of employment, oral or written, implied or in fact, exists between Consultant and Consultant's subcontractor and/or employees and the Company.

4.     REPRESENTATIVE CAPACITY.

4.1 Consultant's Status. Consultant is an independent contractor. In the performance of its duties as Consultant and manager of the Services, Consultant shall act solely as the representative of Company. Nothing herein shall constitute or be construed to be or create a partnership or joint venture between Company and Consultant, or be construed to create a lease, assignment, license, or any other form of grant or conveyance of by Company to Consultant of any contract rights or obligations contained in the Master Agreement or the Vendor Contracts. Consultant may so inform third parties with whom it deals on behalf of Company and may take any other reasonable steps to carry out the intent of this Section 4.1.

5.     OPERATING EXPENSES.

5.1     Company Bears Expenses. In performing its duties hereunder, Consultant shall act solely in the name and for the account of Company.

5.2     Advances and Guaranties. Consultant shall in no event be required to advance any of its own funds for the operation of the Services, or to incur any liability in connection therewith.

6.     WORKING CAPITAL ACCOUNT.

6.1     Initial Deposit. Promptly upon receipt from MRESA and/or Locations or Schools and Libraries Corporation in consideration for completion of the *MRESAnet 2000 Project* at a Location, Company shall provide Consultant with a cash deposit equal to ninety-five percent (95%) of all funds received (the "Deposit Amount"). Such amount shall be deposited into the Working Capital Account for the purpose of payments due to vendors and expenditures as shall be deemed necessary by Consultant and as required by the Location Budget.

6.2     Working Capital Account. All funds to be made available to Consultant by Company for the operation of the Services, including the Deposit Amount, shall be deposited with financial institutions selected by Consultant (the "Working Capital Account"). The Working Capital Account shall at all times be under the absolute control of Consultant, without prejudice to Consultant's obligation of accounting to Company as and when required herein. All monies received from the operation of the Services, and any and all expenses paid by Consultant on account of the operation of the Services. Checks or other instruments of withdrawal shall be signed only by authorized representatives of Consultant.

6.3     Commingling of Funds. The Working Capital Account shall be used in connection with the operation of the Services and the performance of the terms and conditions of this Agreement, and Consultant agrees to segregate all receipts, accounts and records pertaining to the Services operations. Consultant shall not commingle the monies of the Services with the monies of any other

business or Services managed by Consultant.

7.    BOOKS, RECORDS AND STATEMENTS.

7.1    System of Accounts.  Consultant shall keep adequate books of account and other records reflecting the results of Services operations on a cash basis.  Except for such books and records as Consultant may elect to keep in its home office or other suitable location, the books of account and all other records relating to or reflecting the operation of the Services shall be kept at the Corporate Office of the Consultant and shall be available to Company and its representatives at the places kept during the hours of 9:00 a.m. to 5:00 p.m., local time, Monday through Friday, for examination, audit, inspection and transcription (at Company's expense).

8.    INSURANCE.

8.1    Coverages.  During the term of this Agreement, Company shall provide and maintain, at Company's sole cost and expense, insurance of such kinds and amounts as Company shall be required to carry pursuant to the provisions of the Master Agreement.

8.2    Insurers.  All insurance shall be in such form and amounts and with such companies as shall be reasonably satisfactory to Consultant and, to the extent required by any mortgage, lease or other agreement affecting the Services, by all interested parties thereunder.  All policies insuring against damage to the Services or portions thereof or interruptions of business or the like shall name Company, Consultant and its subcontractors, and such other parties as may be required by the provisions of any lease or other agreement affecting the Services as the insureds thereunder.  All policies of liability insurance shall name Company and Consultant, and such other parties required above as the insureds thereunder, and shall contain riders and endorsements adequately protecting the interests of Consultant.  Certificates of all policies of insurance shall be delivered to Consultant prior to the commencement of Consultant's Services hereunder.

9.    EVENTS OF DEFAULT; TERMINATION.

9.1    (a)    Definition.  Each of the following shall constitute an "Event of Default" under this Agreement:

(1)  The failure of either party to pay when due any amount payable to the other party as provided for herein, for a period of 10 days after written notice from the receiving party that such payment is due and payable;

(2)  Company or Consultant fails fully to remedy any other breach of its obligations under this Agreement within 30 days (or such longer time as the other party may in writing allow) after receipt of written notice from such other party specifying one or more breaches of this Agreement; or

(3)  The termination of the Master Agreement.

10.    NOTICES.

Any notice, statement or demand required to be given under this Agreement shall be in writing and shall be delivered personally or electronically, or mailed addressed to:

If to:    Consultant:

Lynxus, Inc
99 Krog Street
Atlanta, Georgia 30307
Attention: President

If to:    Company:

Spherus Technologies, Inc.
1355 Terrell Mill Road, Building 1466
Marietta, Georgia 30067
Attention: Chief Executive Officer

or to such other addresses as Consultant and Company shall designate in the manner herein provided, and shall be deemed to have been given on the day delivered or transmitted or, if mailed, three (3) days after it shall have been mailed, as aforesaid, in any regularly maintained government post office or branch post office. Any notice of an event of default, termination or exercise or non-exercise of a renewal option shall be personally delivered by means of overnight courier with receipted delivery or by certified or registered prepaid, first class U.S. mail, return receipt requested.

11.    INDEMNIFICATIONS.

11.1    Standard of Performance. Consultant shall not, in the performance of this Agreement, be liable to Company or to any other person or entity due to any act or omission, negligent, tortious or otherwise of any agent or employee of Company or due to any such act or omission of Consultant, its agents or employees, unless such act or omission of Consultant constitutes gross negligence or willful misconduct and the damages resulting therefrom are not covered by insurance. For the purposes of this provision, notwithstanding any other provisions of this Agreement, in no event shall Company make any claim against Consultant, its affiliates or subsidiaries on account of any alleged errors of judgment made in good faith in connection with the management and administration of the Services hereunder by Consultant.

11.2    Consultant Indemnification of Company. Notwithstanding any provision of this Agreement, Consultant understands that it is acting independently of Company as an independent Contractor and shall not in any way serve as an Agent or otherwise of Company and that Consultant shall, without any limitation, indemnify, hold and save Company harmless and defend Company from and against any and all claims, liabilities, losses, damages, costs or other expenses, including reasonable attorney's fees and disbursements, arising out of Consultant's performance of its duties under this Agreement.

11.3    Company Indemnification of Consultant. Company agrees to indemnify and save Consultant harmless from all liability, loss, damage, cost, claim or other expense, including reasonable attorneys' fees and disbursements, arising out of (i) the design of the MRESA*net 2000 System*; (ii)

– 9 –

creation and installation of the MRESA*net2000* Network Operations Center; and (iii) a breach of any independent duty of Company to MRESA under the Master Network Implementation Agreement, the performance of which is not expressly undertaken by Consultant herein.

11.4   Survival.   This Section 11 shall survive the expiration or other termination of this Agreement.

12.   MISCELLANEOUS.

12.1 Company and Consultant shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

12.2   The headings of the titles to the several sections of this Agreement are inserted for convenience only and are not intended to affect the meaning of any of the provisions hereof.

12.3   This Agreement may not be changed, modified or terminated, nor may any provisions hereof be waived, except by a writing signed by the party to be charged with any such change, modification, termination or waiver.  The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

12.4   This Agreement shall be binding upon and inure to the benefit of Company, its successors and/or permitted assigns, and shall be binding upon and inure to the benefit of Consultant, its successors and/or permitted assigns.

12.5   This Agreement constitutes the entire Agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.  Company hereby represents that in entering into this Agreement Company has not relied on any projection of earnings, statements as to possibility of future success or other similar matters which may have been prepared by Consultant as to the cost or the future financial success of the Services.

12.6   This Agreement shall be governed by, interpreted under and construed and enforced in accordance with the laws of the State of Georgia.

12.7   In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, provided that the economic basis of this Agreement is not thereby altered.

12.8   Except as herein otherwise provided, whenever in this Agreement the consent or approval of Consultant or Company is required, such consent or approval shall not be unreasonably withheld or delayed.  No such consent shall be effective for purposes of this Agreement unless the same shall be in writing and shall be duly executed by an authorized officer or agent of the party

granting such consent or approval.

IN WITNESS WHEREOF, Consultant and Company have duly executed this Agreement as of the day and year first above written.

CONSULTANT:                                    COMPANY:

LYNXUS, INC.,                                   SPHERUS TECHNOLOGIES, INC.,
a Delaware Corporation                          a Georgia Corporation


By: _____                     By: _____

Title: _CEO LYNXUS, INC_                         Title: _President & CEO_

## "EXHIBIT C"

*Technical Support and Maintenance Call Center: MRESA*

**One-Time Set-Up Fees**

| | |
|---|---|
| Toll Free Number | $2,000 |
| Local Access T-1 | $1,000 |
| Intelligence Base for 200 Schools | $1,500 |
| Collate Troubleshooting Handbook | $2,750 |
| Switch Configuration | $750 |
| FAQ Generation | $500 |
| Contact List Generation & Administration | $500 |
| | $9,000 |

**Ongoing Maintenance For Thirty-Six (36) Months**

Monthly Recurring Telephone Service
Long distance & Toll Free Charges
Technical Support Labor
Database and Intelligence Base Administration

Per School Subtotal: 36 Month Term                  $2,000

NOTE: Our intention is to provide Technical Support and Maintenance for approximately 200 schools in the Year 1 implementation. Additional schools would be facilitated for Years 2 and 3. The per school prices may vary for Years 2 and 3 depending upon the location, size of the school, and depth of implementation.

*On Going Training*

Lynxus, Inc. will provide training as follows:

| | |
|---|---|
| 1 | CBT disc with system functionality and tasks detailed |
| 2 | On site training for the school personnel on an "as needed" basis |
| 3 | A complete documentation and training manual for each school |

The per school cost for On Going Training is a $1,500 one time fee for a 36 Month period.

## "EXHIBIT C"

B

# MORRIS, MANNING & MARTIN

### A LIMITED LIABILITY PARTNERSHIP

ATTORNEYS AT LAW
1600 ATLANTA FINANCIAL CENTER
3343 PEACHTREE ROAD, N.E.

**ATLANTA, GEORGIA 30326-1044**
TELEPHONE 404 233-7000
FACSIMILE 404 365-9532
E-MAIL WJS@MMMLAW.COM

MEMBER,
COMMERCIAL LAW AFFILIATES
WITH INDEPENDENT FIRMS
IN PRINCIPAL CITIES WORLDWIDE

WASHINGTON, D.C. OFFICE
**MORRIS, MANNING & MARTIN, LLP**
THE COLORADO BUILDING
1341 G STREET, N.W.
SUITE 610
WASHINGTON, DC 20005
TELEPHONE 202 408-5153
FACSIMILE 202 408-5146

NORTHSIDE OFFICE
SUITE 150
5775-B PEACHTREE DUNWOODY ROAD
ATLANTA, GEORGIA 30342
TELEPHONE 404 255-6900
FACSIMILE 404 843-2317

WILLIAM J. SHEPPARD
DIRECT DIAL 404 504-7736

October 9, 2000

**VIA HAND DELVIERY**

Joseph L. Kelly, Esq.
600 Virginia Avenue, N.E.
Atlanta, Georgia 30306

> Re:  Internet Services and Implementation Agreement dated September 14, 1999, as amended (the "Agreement") by and between Penn-Akron Corporation, f/k/a Spherus Technologies, Inc. ("Penn-Akron") and Lynxus, Inc. ("Lynxus")

Dear Mr. Kelly:

This confirms receipt of your letter dated September 26, 2000, and is further to my letter to Lynxus dated September 20, 2000. As stated in my prior letter, Lynxus is in default of its obligations under the above-referenced Agreement. Those defaults have been identified by Penn-Akron on several prior occasions and are enumerated in my letter. Lynxus has failed and refused to cure its default within the time allowed by the Agreement. In fact, your letter makes it clear beyond peradventure that Lynxus has no intention of curing its default. Under the circumstances, Penn-Akron has no choice but to terminate the Agreement.

Lynxus is hereby notified that Penn-Akron formally terminates the Agreement. Penn-Akron intends to take steps to protect its rights, including, within limitation, commencing an action to recover all damages that have been and/or will be caused by Lynxus's breach of the Agreement.

If you have any questions regarding this matter, please do not hesitate to call.

Very truly yours,

MORRIS, MANNING & MARTIN, L.L.P.

William J. Sheppard

WJS:kyn

704301

MORRIS, MANNING & MARTIN
A LIMITED LIABILITY PARTNERSHIP

Joseph Kelly, Esq.
October 9, 2000
Page 2


cc:    Lynxus, Inc. (via hand delivery)
       Bernard Hatch (w/ encl.)
       Gary M. Sams, Esq. (w/ encl.)
       Mr. Amer Mardam-bey
       Ms. Tammy Lambert
       Mr. Christopher J.S. Baker
       Robert B. Jackson, IV, Esq.

*F*

# MORRIS, MANNING & MARTIN

A LIMITED LIABILITY PARTNERSHIP

ATTORNEYS AT LAW
1600 ATLANTA FINANCIAL CENTER
3343 PEACHTREE ROAD, N.E.

**ATLANTA, GEORGIA 30326-1044**
TELEPHONE 404 233-7000
FACSIMILE 404 365-9532
E-MAIL WJS@MMMLAW.COM

MEMBER,
COMMERCIAL LAW AFFILIATES
WITH INDEPENDENT FIRMS
IN PRINCIPAL CITIES WORLDWIDE

WASHINGTON, D.C. OFFICE
MORRIS, MANNING & MARTIN, LLP
THE COLORADO BUILDING
1341 G STREET, N.W.
SUITE 610
WASHINGTON, DC 20005
TELEPHONE 202 408-5153
FACSIMILE 202 408-5146

NORTHSIDE OFFICE
SUITE 150
5775-B PEACHTREE DUNWOODY ROAD
ATLANTA, GEORGIA 30342
TELEPHONE 404 256-6900
FACSIMILE 404 843-2317

WILLIAM J. SHEPPARD
DIRECT DIAL 404 504-7736

September 20, 2000

**VIA HAND DELIVERY**

Lynxus, Inc.
Attn: President
99 Krog Street
Atlanta, Georgia 30307

Re:    Internet Services and Implementation Agreement dated September 14, 1999, as amended (the "Agreement") by and between Penn-Akron Corporation, f/k/a Spherus Technologies, Inc. ("Penn-Akron") and Lynxus, Inc. ("Lynxus")

Dear Sir:

This firm represents Penn-Akron in connection with the disputes arising in connection with the above-referenced Agreement. This letter constitutes notice to Lynxus of its defaults under the Agreement and confirms Penn-Akron's intention to terminate the Agreement based upon those defaults.

As you know, under the Agreement, Lynxus agreed to perform certain work in connection with the MRESA*net2000* project (the "Project"). The Project was intended to provide certain school districts served by the Metropolitan Regional Educational Services Agency ("MRESA") access to on-demand video from online sources for use as a teaching aid in classrooms. The Agreement imposed certain obligations on Lynxus, including, among other things the obligations (1) to "coordinate, manage and administer performance" of contractors and suppliers performing work on the Project; (2) to provide an "MRESA*net2000* — Internet and Integration Training Program" at each school once installation was complete; and (3) to maintain books, and records relating to the Project and make them available for inspection by Penn-Akron. [Agreement, Recitals, ¶¶ 3.1(a), 3.1(c).] Furthermore, Lynxus's involvement in the Project was premised on its representation that it would provide the "matching funds" necessary for certain school districts to participate in the Project. Based on the information provided to us, it is clear that Lynxus has breached each of these enumerated obligations.

704301

MORRIS, MANNING & MARTIN
A LIMITED LIABILITY PARTNERSHIP

Lynxus, Inc.
September 20, 2000
Page 2

Lynxus was previously notified of its failure to perform its obligations under the Agreement. Specifically, but without limiting the possibility of other notices, Lynxus was informed by letter dated January 20, 2000, that its failure to supervise properly the work being performed by contractors on the Project had led to the installation of "bootleg" software. Lynxus was notified by letter dated August 18, 2000, that Lynxus had failed to provide access to information concerning the Project and had failed to establish the contribution of "matching funds." In fact, it is apparent that Lynxus has failed and refused to obtain those matching funds. Its failure in this regard constitutes a failure to pay sums owed under the Agreement. Finally, Lynxus is aware, and formal notice is hereby given, that Lynxus has failed to provide the training program required by the Agreement at the schools at which the installation work for the Project has been completed. As a result of this last failure, MRESA and the Schools and Libraries Division has taken the position that the equipment installed at those schools is not yet "operational" and payment of sums owed to Penn-Akron has been withheld.

More than 30 days have passed since Lynxus first received notice of its defaults. Accordingly, Penn-Akron is entitled to terminate the Agreement. This is final notice to Lynxus. If Lynxus does not cure its monetary default within ten (10) days from the date of this letter and if Lynxus does not cure its non-monetary defaults within thirty (30) days from the date of this letter, Penn Akron will terminate the Agreement.

By copy of this letter, Lynxus's counsel of record is notified of this communication. Any further communications with Penn-Akron concerning this matter should be directed to the undersigned as counsel for Penn-Akron. Penn-Akron hereby expressly reserves all of its rights at law and equity. Govern your actions accordingly.

Very truly yours,

MORRIS, MANNING & MARTIN, L.L.P.

William J. Sheppard

WJS:kyn
cc:   Joseph L. Kelley, Esq.
      Mr. Amer Mardam-bey
      Ms. Tammy Lambert
      Mr. Christopher J.S. Baker
      Robert B. Jackson, IV, Esq.

## JOSEPH L. KELLY
ATTORNEY AT LAW
1904 MONROE DRIVE, SUITE 240
ATLANTA, GEORGIA 30324-4860

(404) 607-1330 • FAX (404) 881-6796
joekelly@joekelly.com

December 18, 2000

**VIA TELEFAX AND FIRST CLASS MAIL**
(404) 365-9532

William J. Sheppard, Esq.
Morris, Manning & Martin
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044

  Re: Lynxus, Inc. v. Penn-Akron Corporation; Civil Action File No. 1 00-CV-2543-ODE
    (N.D.Ga,) Our File No. 193.002

Dear Mr. Sheppard:

  I have discussed the matter of your client's claim to the equipment which was purchased by Lynxus, Inc. as part of the contract between the parties. However, as you may be aware, your clients owe a past due balance on Phase II. Lynxus invoiced Spherus/Penn-Akron for costs and services rendered in connection with Phase II of the *MRESAnet 2000* Project up through May 20, 2000 in the amount of $3.5 million. Penn-Akron paid a portion of the invoice being $2.73 million out of which Lynxus then delivered 5% back to Penn-Akron ($136,632.00). The balance due is $863,004.91. It has come to our attention that the SLD may have paid, or will shortly pay, the sums due. In that event, the balance due to Lynxus, Inc. is owed.

  However, inasmuch as we have no way of knowing whether that sum has been paid or not, we suggest settlement of the entire contract termination dispute and past due payments as follows: Spherus/Penn-Akron pays the sums due for Phase I, namely $484,000.00 and pays to Pro-Tech Business Systems, LLC the sum of $135,547.00, being the cost of the equipment itemized on the attached invoice covering the 71 customized rack mount computer systems, as reflected on the invoice attached. Both parties dismiss their claims with prejudice and acknowledge that the contract and all liability of either party thereunder is satisfied. Once the rack mount computer systems have been paid for, your client may pick up all of the equipment including the 71 servers, as described on the attached invoice. I am told that the available equipment will require two tractor-trailers in order to remove the same from the premises.

William J. Sheppard, Esq.
December 18, 2000
Page 2


Otherwise, we will proceed to mitigate our damages and liquidate the inventory as best we can.

Very truly yours,

Joseph L. Kelly

JLK/was

cc:    Thomas E. Arcuragi

Exhibit 4

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO A01-60793 |
| | ) | |
| LYNXUS, INC., | ) | CHAPTER 7 |
| | ) | |
| Debtor(s). | ) | JUDGE MURPHY |

## TRUSTEE'S REPLY TO OBJECTION TO SALE BY SPHERUS

Heroes, Inc./Spherus objects to Trustee's Motion to sell on the grounds that it is the owner of certain of the property scheduled for sale. While the objection appears to be to the sale as a whole, it is in fact limited to certain computer units described on Ex. A to the Motion To Sell as WEBU Units 53 with a value of $265,000 and the item above this one of TB Scan Converters, Units 1000 with a value of $15,000.00

Spherus asserts that either Debtor holds the property as its agent, or that the property has been constructively delivered to Heroes. It is the Estate's position that Debtor was not an agent of Heroes and that the goods have not been delivered.[1]

The background facts may be briefly summarized as follows. The federal government created a program to subsidize placing the Internet in classrooms. MRESA, a body representing several school districts, contracted on behalf of certain schools with Spherus Technologies, Inc. to provide the hardware and software required for this project. Spherus has since changed its ownership, its name, and its counsel two times and is now known as Heroes. Trustee will refer to it as Spherus as that is the name used in the contracts and by most persons when discussing this matter.

---

[1] At the end of February, Heroes asserted that it had a "special interest" in the goods as set forth in Sec. 11-2-501. However, even if they had such an interest, it would not prevail over the claims of a Trustee. See Ex. "A" attached hereto. This line of argument appears to be abandoned. However, this theory would appear to provide the framework most applicable to this matter.

Spherus was not able to perform, and shortly before its default entered into a

contract with Lynxus, Inc. whereby Lynxus took over the contract with Spherus receiving

5% of the proceeds for having the contract or the Federal contract number. The contract

is later modified by a settlement agreement, attached hereto as Exhibit "B", which further

emphasizes that Spherus is to have no role in the performance of the contract. The

settlement arose from disputes as to non-payment by Spherus. The Debtor contends that

Spherus is indebted to it and pre-petition commenced an action in District Court, which is

now stayed. [2]

The equipment in question was purchased by Lynxus, Inc. to be used in the

performance of the contract with the school. Spherus apparently passed on to Lynxus all

or some of the monies for this equipment, but allegedly defaulted upon other payments to

the Debtor.

## A.  LYNXUS DID NOT OWE A FIDUCIARY DUTY TO SPHERUS

The issue raised is the nature of the relationship between Lynxus and Spherus.

Spherus categorizes the relationship as fiduciary/agent, and Lynxus categorizes the deal

as its assuming performance of the contract.

Spherus has quoted certain words from the initial contract. However, some other

terms seem more to the point. Specifically Lynxus, Inc. is a "Consultant" (See initial

paragraph, Recitals). Lynxus is to "coordinate, manage and administer performance" to

the schools. See Recital d. The contract refers to "Vendor Contracts" which are contracts

---

[2] While the contract between MERESA and Spherus is subject to regular audit by Arthur Anderson and a
special audit by the FCC seeking to find out what happened to monies paid to Spherus, the accounts
between Spherus and Lynxus, Inc. has not been audited.

between Spherus and providers that Lynxus is to manage for Spherus. Sec. 1.6, 1.1.

However, as the project continued, Lynxus entered into its own contracts with third

parties, and Lunxus directly contracted for the goods in question.

As seen by reading the duties of Lynxus (see Sec. 3.1, 3.9, 7.1) it is responsible

for the implementation of the contract. Lynxus is to receive 95% of the funds due from

the schools. Sec. 3.2. Lynxus thus undertakes the profit risk. If it can perform and make a

profit for 95% of the funds, it makes a profit. If not it has a loss.

Most importantly, Lynxus retains all discretion and judgment as to carrying out

the contract. Sec. 3.6. Spherus retains no control over the time and manner of

performance of the contract. Since retaining control over the time and manner of

performance is essential to create fiduciary/ agent relationship, the claim that such a

relationship exists fails on this point. McMullan v Georgia Girl Fashions, Inc. 348 S.E.2d

748, 750, 180 Ga. App. 228,230 (1986), Wells v Vi-Mac, Inc. 486 S.E.2d 400, 226 Ga.

App. 261 (1997)

Lynxus is to retain its own subcontractors and other assistance and has sole

responsibility for their performance. Sec. 3.9.

The contract provides that the "Consultant is an independent contractor" Sec. 4.1.

This section specifically disclaims any relationship of partnership. Finally, the contract

provides "Notwithstanding any provision of this Agreement, Consultant understands that

it is acting independently of the Company as an independent Contractor and shall not in

any way serve as an Agent or otherwise of Company ...." Sec. 11.2

As the contract progressed and Spherus defaulted on its one obligation of passing

on 95% of the funds it received, the contract was modified, making in clear that Spherus

was to stay away from the work and was only a conduit for funds.  See Exhibit "B".
Specifically:

Paragraph 3.1(a) dealing with Consultant's services is amended to state "It is agreed and acknowledged by all parties that the scope of services hereunder is co-terminus with the scope of services to be provided by Spherus pursuant to the Spherus/MRESA Contract."  Paragraph 3.1(h) is amended to allow Lynxus to directly invoice MRESA. An agency is created for and limited to this limited purpose.

Paragraph 3.2(b) is amended to provide that "All funds due to be paid over to the Consultant by Company hereunder shall be delivered to Consultant by Company no later than 72 hours after receipt of such funds by the Company."

The letter of interpretation to Mr. Sams on behalf of MRESA which is attached to and incorporated into the Amendment, Exhibit B, provides in part the following:

First, in order to solve prior problems, "all of the work to be performed or goods or services to be delivered by Spherus…shall actually be performed or delivered … by Lynxus, Inc. (including contractors, vendors, etc. employed by Lynxus, Inc.).  MRESA acknowledges and accepts that Spherus has assigned all responsibility for performance or deliver of goods or services to Lynxus, Inc. and agrees that it will have no recourse against Spherus for any matters which are now the responsibility of Lynxus, Inc. …Spherus, including its employees consultants or assigns or agents, shall have no contact in furtherance of completion or use of the work with any MRESA local schools or MRESA school systems."  The final addition is that the funds Spherus receives shall "be held in trust for delivery to Lynxus, Inc."

The testimony will also be that Lynxus acted to perform the contract and did not

act as an agent under the direction and control of Spherus.

## B. CONSTRUCTIVE DELIVERY.

Spherus contends alternatively that the goods were constructively delivered to it

and that Lynxus held physical possession only as its agent or bailee. Constructive

possession requires the party claiming possession to prove it exercised dominion and

control over the property. Compare 44-5-82 Ga. Code. Ann. Walker & Rogers v Malsby

Co. 67 S.E. 1039, 1041, 134 Ga. 399 (1910), Stephenson v Wyatt Hardware Co. 135

S.E. 316, 36 Ga App, 57 (1926). There is no such evidence[3].

In this case the goods were be delivered to the schools by Lynxus. Under the UCC

title passes on tender at the destination. Sec. 11-2-402 (2)(b). Of course, even in that case

title would pass to the schools and not to Spherus.

## C. CONCLUSION

All that occurred was that partial payment under a contract was made by MRESA

or the United States on behalf of the schools. Spherus passed on a portion of the funds

received to Lynxus, which declared bankruptcy prior to delivery.   If there had been a

theft loss, all would look to Lynxus to absorb the loss.  Similarly, Spherus lacks title or a

perfected security interest placing them ahead of other unsecured creditors.

---

[3] Spherus pleads that it is still performing the contact which it is not capable of doing. In fact it has not been terminated and there are some parties discussing assumption of and completion of the duties under this contract.

Respectfully submitted this the ___ day of April, 2001.

ELLENBERG, OGIER & ROTHSCHILD, P.C.

By: _____
Richard D. Ellenberg
Georgia Bar No. 243500

170 Mitchell Street, S.W.
Atlanta, Georgia 30303-3424
(404) 525-4000

March 1, 2001

David W. Cranshaw
Bill Sheppard
Morris, Manning & Martin
1600 Atlanta Financial Center
3343 Peachtree Rd. N.E.
Atlanta, Ga. 30326-1044

      RE:   *Lynxus, Inc.*
             *Bankruptcy Case No. 01-60793-MHM*

Dear David and Bill:

I appreciate your heads up about your client's claim to title of the goods in the warehouse and possible other property of the Estate.

The status of that property is that it is insured and we are soliciting bids for its sale. If the parties we have contacted do not provide us with a satisfactory bid, we intend in about a week to list the property on the NATB listings. We will add you to the service list so that you receive notice of any applications to sell.

I have looked briefly at your claim. I have not thoroughly researched the issue and could be missing some important points, but the following appears to be the law after this surface review:

Assuming that the goods have been identified and paid for, it appears there could be a claim to a "special interest" in the property. §11-2-501. Specific performance would not be applicable since the goods are not unique, and can be covered. §11-2-716. There is a right to recover the goods if the "seller becomes insolvent within ten days after receipt of the first installment on their price." §11-2-502. That is a pretty narrow window of time to trigger this section and it is not likely to have been satisfied.

Even if the insolvency occurred during this window, the issue is the priority of rights between the Buyer and Strong Armed Trustee. The Code would appear to indicate that the "special interest" in property is superior to the interest of unsecured creditors, not to the Trustee as a perfected judgment lien creditor. §11-2-402, 9-113.

Thus, I am not sure what your client would have other than an unsecured claim under any set of proposed facts.



EXHIBIT
*a*

March 1, 2001
Page Two of Two

It may be that your client and the Estate both might benefit from selling the goods to your client, converting its claim to the property to a claim to the proceeds subject to the 506(c) claim of the Estate. That might minimize the exposure for your client and increase the Estate if your client is unsecured.

Sincerely,

ELLENBERG, OGIER & ROTHSCHILD, P.C.

By: _____
     Richard D. Ellenberg, Esquire

RDE/alh

cc. Tamara Ogier as Trustee
    Dorothy Potter, Paralegal

April 26, 2000

BY TELECOPIER TO:
404-881-6796 AND
BY FIRST CLASS MAIL

Joseph L. Kelly, Esq.
600 Virginia Avenue N.E.
Atlanta, Georgia 30306-3629

Re:  Lynxus, Inc. v. Spherus Technologies, Inc., Civil Action
No. 00 VS 000545 A, State Court of Fulton County, Georgia

Dear Mr. Kelly:

This letter is intended to memorialize certain changes and
additions to the Lynxus, Inc. Internet Services and Implementation
Agreement with Spherus Technologies, Inc. of September 14, 1999
(the "Contract").

It is also intended to document the terms of the settlement
agreement among the parties to the pending lawsuit entitled Lynxus,
Inc. v. Spherus Technologies, Inc., Civil Action No. 00 VS
000545 A, State Court of Fulton County, Georgia (the "Civil
Action").

I.   Reinstatement of the Contract

Subject to amendments contained in this letter the Contract is
reinstated.

The Master Network Implementation Agreement between Spherus
Technologies, Inc. and Metropolitan Regional Educational Services
Agency ("MRESA") (said contract referred to hereinafter as the
"Spherus/MRESA Contract") has been the subject of a dispute between
Spherus and MRESA which is resolved by certain agreements pertain-
ing to interpretation of this Spherus/MRESA Contract and to matters
of future discharge and performance of it memorialized in a letter
of April 26, 2000 signed by counsel for Spherus and countersigned
by counsel for MRESA (the "interpretation letter"). That interpre-
tation letter is attached hereto as Exhibit A. Lynxus concurs in
and agrees to the statements made and interpretations agreed upon
in that interpretation letter. With respect to the matters


EXHIBIT
B

Joseph L. Kelly, Esq.
April 17, 2000
Page 2

discussed in the interpretation letter, this letter is a modification of the Contract in accordance with Section 1.1 of the Contract.

Paragraph 2 of the Contract is amended to provide that the term of the Contract is through completion of Phase II and Phase III of the Contract, expected to be completed by June 30, 2001, but possibly to be completed thereafter, and shall also include the time necessary for completion of on-going maintenance and training responsibilities as provided in the Spherus/MRESA Contract.

The first four sentences of Paragraph 3.1(a) are stricken in their entirety and the following is substituted: "It is agreed and acknowledged by all parties that the scope of services hereunder is co-terminus with the scope of services to be provided by Spherus pursuant to the Spherus/MRESA Contract, including the above-referenced interpretation letter." The last two sentences of said Paragraph 3.1(a), beginning with "In connection with the technical support maintenance . . ." shall remain as written.

In Paragraph 3.1(b) the second sentence of said paragraph is amended as follows: [the failure of any vendor or other provider] "other than Lynxus" [to perform under the vendor Contract] . . .

In Paragraph 3.1(g), the provisions relating to commission on funds raised shall apply equally to both Spherus and Lynxus so that either party raising funds on behalf of non-profit entities expressly for the benefit of assisting locations as provided shall be entitled to a commission on all funds raised of 25%.

A new paragraph designated 3.1(h) is added to provide that Lynxus is hereby appointed agent and attorney-in-fact for Spherus for the purpose of preparing and sending invoices to any party or entity responsible to pay Spherus for any goods or services provided under the Master Network Implementation Agreement. This agency shall exist notwithstanding any other terms and conditions of the Contract. This agency shall be limited to billing and invoicing functions and there shall be no other agency or attorney-in-fact relationship between Spherus and Lynxus arising out of this Contract.

In Paragraph 3.2(b) the last ~~two~~ sentences ~~is~~ deleted in its *(pertaining to location funds and reserves are)* entirety and replaced with the following: "All funds due to be paid over to the Consultant by Company hereunder shall be delivered to

Joseph L. Kelly, Esq.
April 26, 2000
Page 3

Consultant by Company no later than 72 hours after receipt of such funds by Company."

Paragraph 3.2(c) is stricken in its entirety and replaced by the following: "Company shall be responsible for payment of any interest, penalties, surcharges, liquidated damages or costs of any kind incurred or accrued by reason of late or non-payment to vendors caused by Company's failure to timely deliver the money as provided by subparagraph (b) of this Paragraph 3.2, above."

Paragraph 11.1 is deleted in its entirety.

Clause (i) of Paragraph 11.3 is deleted in its entirety. Clause (iii) of Paragraph 11.3 is amended to read "and (iii) a breach of any independent duty of Company to MRESA, the performance of which is not expressly undertaken by Consultant herein."

Otherwise, the Contract shall remain in full force and effect.

## II.  Payments to Lynxus

Lynxus claims to be owed $1,047,000 for work performed and goods and services provided pursuant to Phase I of the Spherus/MRESA Contract. $250,000 of that amount was paid by Spherus to Lynxus on April 6, 2000.  Spherus intends to pay an additional $600,000 of that amount out of funds expected to be paid by MRESA to Spherus within 45 days.  Spherus has authorized and directed MRESA to pay such funds to Spherus by issuing a check or checks made out jointly to Spherus Technologies, Inc. and Lynxus, Inc. Upon receipt of such checks by Spherus, Spherus will endorse said checks and deliver them to Lynxus.  The remaining approximately $200,000 owed will be paid immediately upon receipt by Spherus of certain Phase I funds currently expected from the Schools and Libraries Corporation, but in any event, all such funds shall be paid by Spherus within 45 days.

## III.  Dismissal of Litigation

This agreement constitutes a settlement of the Civil Action. The parties agree to dismiss the Civil Action including all counterclaims made therein, without prejudice, upon receipt by Lynxus of the full amount of the $1,047,000 claimed.  Meanwhile, the parties agree to do nothing in the Civil Action and to extend the time for all further proceedings in Civil Action for 45 days.




Joseph L. Kelly, Esq.
April 26, 2000
Page 4


        If you agree with the foregoing terms and conditions, please
countersign this letter on behalf of Lynxus, Inc. and return an
original countersigned copy of it to us.

        With kindest personal regards, we are,

                                Very truly yours,

                                HIGGINS & DUBNER


                                Michael W. Higgins

MWH/cab


COUNTERSIGNED:


Joseph L. Kelly

Attorney for Lynxus, Inc.



# HIGGINS & DUBNER
### ATTORNEYS AT LAW
ATLANTA FINANCIAL CENTER
3333 PEACHTREE ROAD, N.E.
SUITE 230
ATLANTA, GEORGIA 30326

MICHAEL W. HIGGINS

TELEPHONE (404) 264-1011
TELECOPIER (404) 264-1044

*26*
April 17, 2000

BY TELECOPIER TO:
404-378-3617 AND
BY FIRST CLASS MAIL

Gary M. Sams, Esq.
Weekes & Candler, LLP
Suite 300
One Decatur TownCenter
150 East Ponce De Leon Avenue
Decatur, Georgia 30030

Re:  Master Network Implementation Agreement between
     MRESA and Spherus Technologies, Inc. dated March 19, 1999
     (the "Spherus/MRESA Contract")

Dear Mr. Sams:

    This letter constitutes a memorandum confirming the resolution
of disputes which have arisen between our client, Spherus Technol-
ogies, Inc. ("Spherus") and your client, Metropolitan Regional
Educational Services Agency ("MRESA") including those disputes and
claims referenced in our letter to MRESA in care of Bernard Hatch,
Executive Director, of February 17, 2000, which contained a demand
for mediation in accordance with the Spherus/MRESA Contract.  While
both MRESA and Spherus will be bound by this agreement, this is not
a novation or replacement of the Spherus/MRESA Contract.  Rather,
it is an agreement to resolve questions of interpretation and
continuing discharge and performance of the Spherus/MRESA Contract.
The terms of this agreement are as follows:

1.   Spherus withdraws its demand for mediation of February 17,
     2000.

2.   In order to give assurances to MRESA that past problems
     regarding performance of the Spherus/MRESA Contract by Spherus
     have been resolved, Spherus agrees that all "Phase II" and
     "Phase III" work to be performed or goods or services to be
     delivered by Spherus under the Spherus/MRESA Contract shall
     actually be performed or delivered by the Spherus sub-contrac-

Gary M. Sams, Esq.
April 27, 2000
Page 2

tor, Lynxus, Inc. (including contractors, vendors, etc.
employed by Lynxus, Inc.)

3.   In order to eliminate confusion regarding the definition of
"work to be performed," including possible controversies
arising out of previously undocumented change orders, the
description of the work to be performed is set forth below.
Instead of the description found in the Amendment to Master
Network Implementation Agreement of August 23, 1999, which was
intended to pertain to Phase I of the MRESANet 2000 project,
the following description will control with respect to all
further work under the Spherus/MRESA Contract:

a.   One video network server will be installed at each
of at least 100 of the proposed 192 schools in Phase II,
~~up to at least~~ 43 ~~of 293~~ schools in Phase III that will
receive and temporarily store, via the Internet and
installed satellite dishes, selections of educational
programming for play in the classroom.   The worksta-
tion-support capacity of each network server ~~while
unlimited, will be able to support~~ 45 stations simulta-
neously ~~if Phase II or Phase III do not go forward~~
~~MRESA will not undertake any similar installation or~~

b.   Each server will be configured to operate either
independently from, or in tandem with, the current school
network as desired.

c.   As initially configured, each server will have the
capability of streaming ~~five (5)~~ video selections
simultaneously.   up to 300

d.   The remote servers will interface with a central
server, which will host the main selection menus,
tracking of titles for licensing, web hosting, and other
specific usage needs.

e.   The cabling infrastructure that exists at each
location will be enhanced, if necessary, to meet TIA/EIA
standards required for transmitting video. If a location
does not have an existing cabling infrastructure, one
will be installed that meets these requirements.

*Handwritten annotations in margins:*

*Top right handwritten text:* ...that Spherus has assigned all responsibility for performance or delivery of goods or services to Lynxus, Inc. and agrees that it will have no recourse against Spherus for any matters which are now the responsibility of Lynxus, Inc. The letter of April 26, 2000 from counsel for Spherus to

*Right margin vertical text:* counsel for Lynxus confirming such assignment or responsibility has been published to MRESA. Spherus, including its employees consultants or other assigns or agents, shall have no contact in furtherance of completion or use of the work with any MRESA local schools or MRESA school systems. Lynxus will also be responsible for any tasks remaining with respect to Phase I completion in Clay County, Chatham County and City of... North Metro.

*Bottom handwritten:* project until 12/31/04

*Left margin vertical text:* ...videos, and the included switch can distribute up to...

*Left middle handwritten:* MRESA agrees to act in good faith in furtherance of Phases II and III.

*Handwritten "and 2" near item a.*

Gary M. Sams, Esq.
April 17, 2000
Page 3

f.   Initially, MRESAnet will consist of one (1) CAT 5
drop per classroom and six (6) CAT 5 drops in the media
center or library. Any existing cabling will be utilized
in preference to installing new cables. A maximum of 309
buildings and 8,288 classrooms will be included in
Phase II.   A proportionate number of buildings and
classrooms will be included in Phase III.

g.   Network software required for operation of MRESAnet
will be furnished with each server. The main functions of
the software will be:

    i.    Receiving and storing information

    ii.   Ordering programs requested from the MRESA
       central server

    iii.  Tracking of titles for licensing, and other
       specific usage needs

    iv.   Interfacing with the MRESAnet server web site

    v.    Addressing network security issues

    vi.   Diagnosing and solving network performance
       problems, tuning existing networks, and plan-
       ning network changes

h.   Two T1 voice and data telecommunication lines will
be maintained in MRESA central facility and one T-1 line
will be maintained in the North Metro Program buildings.
High speed Internet services for all three T-1 lines will
be included.

i.   Twenty-four dial-up lines (POTS) will be maintained
for local and long distance service in the MRESA build-
ing; six dial-up lines (POTS) will be maintained for
local and long distance charges in the North Metro
Program building.

Gary M. Sams, Esq.
April 26, 2000
Page 4

    j.    A comprehensive on-site service and maintenance program that will provide full technical support and upgrade ability for 3 years.

    k.    The price will be $177,000 per school.

4.    Concerning payments to be made by MRESA to Spherus for work performed under Phase I of the MRESAnet 2000 project, consisting of funds either already received or to be received from the City of Decatur, Chatham County and Glynn County School Systems in the approximate aggregate amount of $850,000, the following agreements are made:

    a.    Payments of said funds by MRESA shall be in the form of checks made out to "Spherus Technologies, Inc. and Lynxus, Inc."

    b.    MRESA will retain $~~150,000~~ **200,000** but will pay the remaining amounts from the aforesaid sources with respect to Phase I promptly after such amounts are received by MRESA. *in full payment of any obligation of Spherus with respect to the Network*

    c.    As concerns the $~~150,000~~ **200,000** retainage, this amount is ~~intended to secure MRESA with respect to claims against Spherus for (1) cut-off of MRESA's telephone service occurring in January, 2000 and (2) for work to be performed on the Network Operating Center (NOC)~~. There is no agreement here concerning liability or damages with respect to either of those matters. The parties will try in good faith to resolve those disputes and, failing such a resolution, either party may proceed with dispute resolution in accordance with the Spherus/MRESA Contract.

5.    Spherus and MRESA agree that the Spherus/MRESA Contract pertains to all three phases of the MRESAnet 2000 project including Phase I, already substantially performed; Phase II, intended to be completed by June 30, 2000; and Phase III, intended to be completed by June 30, 2001.

6.    Paragraph 7.03 of the Spherus/MRESA Contract which was never effective, there being no "Exhibit C" to that contract, is considered deleted.

*(handwritten left margin, rotated)* the cut off of MRESA's phone service in early 2000.

*(handwritten right margin, rotated)* Operating center (NOC) and the phase of the project.

Gary M. Sams, Esq.
April 26, 2000
Page 5

7.   In the course of the current dispute, it has become obvious
that certain legally impossible or nonsensical provisions were
inserted in the Spherus/MRESA Contract. In order to clarify
future dispute resolution, if any, Paragraph 8.0 of the
Spherus/MRESA Contract shall be considered wholly ineffective
or deleted and the following substituted:

8.0   TERMINATION OF AGREEMENT.

8.01 This Agreement may be terminated by
either party upon the other party's breach of
a material covenant, obligation or warranty
under this Agreement and such breach remains
uncured for a period of 90 days after notice
thereof is sent to such other party.

8.   Please note that all notices addressed to Spherus should now
be directed to:

Mr. Christopher J.S. Baker
Spherus Technologies, Inc.
1355 Terrell Mill Road
Building 1466
Marietta, Georgia 30067

Please signify MRESA's consent to this letter by countersign-
ing this letter and return an original countersigned copy of it to
us.

With kindest personal regards, we are,

¶9 Paragraph 4.05 of the Spherus/MRESA      Very truly yours,
contract is deleted and the following
is substituted: "MRESA shall collect       HIGGINS & DUFFER
and pay over to Spherus all
contributions toward the respective        Michael W. Higgins
ocation Budgets in trust for delivery to Lynxus, Inc. for disbursement to
MWH/cab
program vendors and for other approved program costs as designated by

Gary M. Sams, Esq.
April 25, 2000
Page 6


COUNTERSIGNED:



Gary M. Sams

Attorney for Metropolitan Regional
Educational Services Agency

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

IN RE:                          )        CASE NO A01-60793
                                )
LYNXUS, INC.,                   )        CHAPTER 7
                                )
        Debtor(s).              )        JUDGE  MURPHY

## CERTIFICATE OF SERVICE

This is to certify that on April ____, 2001 I served a true and correct copy of the

TRUSTEE'S REPLY TO OBJECTION TO SALE OF HEROES, INC. to all parties

listed below, via either Hand Delivery OR United States Mail, postage pre-paid and

addressed as follows:

This the  1 9  day of April, 2001.

**VIA HAND DELIVERY**
William Sheppard, Esq.
1600 Atlanta Financial Center
3343 Peachtree Rd., NE
Atlanta, Georgia 30326

**VIA UNITED STATES MAIL**
United States Trustee
362 Richard B. Russell Bldg.
75 Spring Street, S.W.
Atlanta, Georgia 30303

                                ELLENBERG, OGIER & ROTHSCHILD, P.C.

                                By: _____
                                    Richard D. Ellenberg
                                    Georgia Bar No. 243500

170 Mitchell Street, S.W.
Atlanta, Georgia 30303-3424
(404) 525-4000

Exhibit 5

ENTERED ON DOCKET
4-26-2001

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE:                                    )        CASE NO. 01-60793
                                          )
LYNXUS, INC.                              )        CHAPTER 7
                    Debtor.               )        JUDGE MURPHY
_____       )

## ORDER

Trustee's Motion to Sell Assets of the Estate Free and Clear of Liens by Public

Auction Conducted By Elrod Auction Company, Inc., and By Private Sales Through The

National Association of Bankruptcy Trustees' Internet Site And For Authorization To Pay

Certain Administrative Expenses and Amended Motion together with the objection of

Heroes/Spherus to Trustee's Motion and Amended Motion duly came before this Court for

hearing on April 23, 2001, on the 10:30 A.M. calendar before the Honorable James E.

Massey,  United States Bankruptcy Judge; and, this Court having heard from Richard

Ellenberg,  counsel for Trustee and William Sheppard, counsel for Objector;

**IT IS HEREBY ORDERED** that Trustee's Motion be and the same is hereby

**GRANTED** pursuant to the following terms and conditions:

1.  Trustee is authorized to have Elrod Auction Company, Inc., conduct the public

    auction of the Estate's unsold assets as scheduled for 10:00 A.M. on April 26, 2001;

2.  Trustee is authorized to accept the bids for the sale of assets received through the

    National Association of Bankruptcy Trustees' Internet site.  Attached hereto and

    incorporated  herein as Exhibit "A" are the bids received by Trustee.   Provided that

    if the purchase price for any of these assets remain unpaid as of the date of the

29

auction, April 26, 2001, the Trustee may offer the same for sale in the public auction;

3. Trustee is authorized to withdraw any Estate property from the auction;

4. The claim of title of Heroes/Spherus shall attach to the proceeds of sale, which proceeds shall be placed by the Trustee in a segregated interest bearing account. Heroes has claimed title to the computer units described on Ex. A to the Motion To Sell as WEBU Units 53 with a value of $265,000 and the item above this one of TB Scan Converters, Units 1000 with a value of $15,000.00, and may examine the Debtor's principal and inform the Trustee prior to the sale of any other items as to which it asserts title.

5. Trustee is authorized to remit to Landlord, Krog Associates, L.L.P. administrative rent in an amount not exceeding $3000.00 when said funds are available and sufficient to pay all administrative expenses; and,

6. The sales shall be free and clear of liens with any liens found to be valid by this Court attaching to the proceeds of sale.

**IT IS SO ORDERED** at Atlanta, Georgia, this the 25 day of April,

2001.

_____
**JAMES E. MASSEY**
**UNITED STATES BANKRUPTCY JUDGE**

Prepared by:
Ellenberg, Ogier & Rothschild, P.C.

By: _____
Richard D. Ellenberg
Ga. Bar No. 243500
170 Mitchell St., SW
Atlanta, GA 30303
(404)525-4000

**DISTRIBUTION LIST FOR ORDER:**

Ellenberg, Ogier & Rothschild, P.C.
170 Mitchell St., SW
Atlanta, GA 30303

David W. Cranshaw
Bill Sheppard
Morris, Manning & Martin
1600 Atlanta Financial Center
3343 Peachtree Rd. N.E.
Atlanta, Ga. 30326-1044

United States Trustee
362 Richard B. Russell Bldg.
75 Spring Street
GA 30303

J. Michael Lamberth, Esq.
Lamberth, Bonapfel, Cifelli & Stokes, PA
EastTower - Suite 550
3343 Peachtree Road, NE
Atlanta, GA 30326-1022

EXHIBIT A

Received from Voyager Technologies, Inc.

X-Stop Filters (8) @ $750.00 each
CopperEdge150 (1) @ $2000.00
Cisco 7200 (1) @ $10,000.00
Extreme Summit48 (3) @  $1000.00 each
ExtremeSummit24 (4) @ $750.00 each
APC Smart UPS 2200 (4) @ $200 each
HP Surestore DLT40 (4) @ $200.00 each
HP Surestore DAT24 (3) @ $50.00 each
Pipeline 75 (50 @ $5.00 each

Received from Computronics Enterprises, Inc.

HP Laserjet 6P (1) @ $50.00
HPLaserjet 4000 printers (4) @ $300.00 each
HPLaserjet 4500 (1) @ 450.00

List of Parties Notified:

> Lynxus, Inc.
> 99 Krog Street
> Atlanta, GA 30307
>
> J. Michael Lamberth
> Lamberth, Bonapfel, Cifelli & Stokes, PA
> East Tower - Suite 550
> 3343 Peachtree Road, NE
> Atlanta, GA 30326-1022
>
> Tamara Miles Ogier
> Ellenberg & Ogier, P.C.
> 170 Mitchell St. S.W.
> Atlanta, GA 30303
>
> C. David Butler
> Office of the U. S. Trustee
> Suite 362
> Richard B. Russell Building
> 75 Spring Street, SW
> Atlanta, GA 30303
>
> David W. Crenshaw
> Morris, Manning & Martin
> 1600 Atlanta Financial Center
> 3343 Peachtree Rd., N.E.
> Bill Sheppard
> Atlanta, GA 30326-1044

Number of labels for parties shown above: 5

Pursuant to Fed. R. Bank. P. 9022 and 7005, I certify that on the date stated below, I served a copy of the foregoing document(s) on each of the persons and entities named in the foregoing list either by United States Mail at the respective addresses shown or, if an attorney subscribes to a mail pick-up box in the Clerk's Office, by placing a copy in such attorney's mail pick-up box.

Date: _4-26-2001_____     W. Yvonne Evans, Clerk of Court

                              By:___*Cheryl Shott*_____
                              Cheryl Shortt     (SHORTTC)


Labels for Case: 01-60793     Page: 1